# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| **KEVIN MCBRIDE,** | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | **CIVIL NO. 2:13-CV-272-DBH** |
| v. | ) | |
| | ) | |
| **CITY OF WESTBROOK,** | ) | |
| | ) | |
| DEFENDANT | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case challenges the constitutionality of Westbrook Police Department procedures in requiring a residential tenant at will—who had not been named in a Forcible Entry and Detainer ("FED")[1] Action or served with a writ of possession—to vacate his apartment. I previously granted summary judgment in favor of the individual police officers because I concluded that they were entitled to qualified immunity against suit.[2] I also granted summary judgment against a co-tenant who *had* been named in an FED action and served with a writ of possession.[3] I denied the City of Westbrook's motion for summary judgment against the remaining plaintiff, Kevin McBride.[4]

The remainder of the case—McBride v. City of Westbrook—proceeded to jury trial on the issue whether McBride actually was a tenant at will. The jury

---

[1] "A Forcible Entry and Detainer Action ("FED") is the formal name for the eviction hearing that takes place in [Maine] District court." Evictions (Forcible Entry Detainer (FED)), State of Maine Judicial Branch, http://www.courts.maine.gov/maine_courts/district/evictions.html.

[2] See Dec. & Order on Defs.' Mot. for Summ. J., (Nov. 19, 2014) (ECF No. 47).

[3] Id.

[4] Dec. & Order on Def.'s Mot. for Summ. J., No. 2:13-cv-272-DBH, 2015 WL 685957 (Feb. 18, 2015).

concluded that he was.[5]  The parties agreed that I should resolve all remaining issues in the case[6] and, on August 4, 2015, I conducted a bench trial.  I conclude that although the police treatment of McBride produced dire consequences, the City of Westbrook has no federal liability under 42 U.S.C. § 1983 because McBride has failed to show that the police officers acted pursuant to Westbrook custom or policy.

The following are my findings of fact and conclusions of law under Fed. R. Civ. P. 52.

## FINDINGS OF FACT[7]

1.     The jury in this case concluded that on July 9, 2013, the plaintiff Kevin McBride was a tenant at will at 277 Main Street, Apartment 2, Westbrook, Maine.[8]  Jury Verdict Form, No. 2:13-cv-272-DBH (June 22, 2015) (ECF No. 111).  There was no signed written lease.  Testimony of A. LeClerc, Jury Trial (June 22, 2015) (landlord provided a written lease, but it was never executed).

2.     The owners and landlords for the building were Amie and Marc LeClerc.  Id.; Testimony of A. LeClerc, Bench Trial (Aug. 4, 2015).

3.     McBride shared the apartment with Anne Blake, his domestic partner of over fifteen years.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).

---

[5] Jury Verdict Form, No. 2:13-cv-272-DBH (June 22, 2015) (ECF No. 111).
[6] The parties agreed at a June 3, 2015, Trial Management Conference that the issue whether McBride was a tenant at will would be decided by the jury, and all other issues of fact and law would be resolved at the bench trial.  Minute Entry for Continued Trial Management Conference (June 3, 2015) (ECF No. 100).
[7] I find all the facts based upon a preponderance of the evidence, it being the plaintiff's burden to establish all the elements of liability, causation, and damages.
[8] The jury obviously did not believe the landlady's testimony about McBride's status.

4.      Blake and McBride moved there because Blake's daughter and grandchildren, for whom Blake babysat, lived in a separate apartment in the same building.  Testimony of A. Blake, Jury Trial (June 22, 2015).

5.      The agreed-upon rent was $1,000 monthly, which did not include the cost of heat or utilities.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).

6.      By mid-2013, the rent arrearage on Apartment 2 was $1600. Judgment Forcible Entry and Detainer (Pl.'s Ex. 3).

7.      The landlords brought a successful FED lawsuit against Blake to evict her for nonpayment of rent.  Id.; Complaint for Forcible Entry and Detainer (Pl.'s Ex. 2).  They secured a Writ of Possession against her (Pl.'s Ex. 4), and caused it to be served upon her on July 5, 2013.  Id.  The landlords did not name McBride in the FED lawsuit, Complaint for Forcible Entry and Detainer (Pl.'s Ex. 2), or the Writ of Possession (Pl.'s Ex. 4).  Although the Maine FED statute provides that "[w]hen there are multiple occupants of an apartment or residence, the process of forcible entry and detainer is effective against all occupants if the plaintiff names as parties '*all other occupants*' together with all adult individuals whose names appear on the lease or rental agreement for the premises or whose tenancy the plaintiff has acknowledged by acceptance of rent or otherwise,"  14 M.R.S.A. § 6001 (emphasis added), the LeClercs failed to name "all other occupants" in their FED lawsuit, and the writ of possession named only Blake. Complaint for Forcible Entry and Detainer (Pl.'s Ex. 2); Writ of Possession (Pl.'s Ex. 4).

8.      McBride knew at the time about the FED lawsuit and Writ of Possession against Blake.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).

9.      In 2013, Captain Thomas Roth was second-in-command of the Westbrook Police Department.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015). It was Roth's role to direct other officers and ensure that they were trained.  Id.

10.     Westbrook's police chief was the ultimate decisionmaker on matters of policy for the department.  Id.

11.     In the spring of 2013, Amie LeClerc contacted Captain Roth about a problem she was having with a tenant.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Roth told her that she would have to go through a court process before the Westbrook police could assist her.  Id.

12.     On July 9, 2013, LeClerc brought to Captain Roth the civil eviction papers (the FED judgment and the writ of possession) she had obtained against Blake for 277 Main Street, Testimony of T. Roth, Bench Trial (Aug. 4, 2015), the documents that named only Anne Blake and did not refer to "all Other Occupants."  Judgment Forcible Entry and Detainer (Pl.'s Ex. 3); Writ of Possession (Pl.'s Ex. 4).  LeClerc specifically requested a no trespass notice, by name, against Anne Blake.  Testimony of A. LeClerc, Bench Trial (Aug. 4, 2015).

13.     LeClerc's goal in contacting the City of Westbrook Police Department was that they "execute the writ of possession and give [the LeClercs] back possession of the apartment."  Testimony of A. LeClerc, Bench Trial (Aug. 4, 2015).  LeClerc told Captain Roth that she had "reason to believe" that, in addition to Blake, there "may be at least two other people in the apartment." Testimony of A. LeClerc, Bench Trial (Aug. 4, 2015); see also Testimony of T. Roth, Jury Trial (June 22, 2015).  LeClerc had no discussion with Captain Roth about serving trespass notices on anyone other than Blake.  Testimony of A.

LeClerc, Bench Trial (Aug. 4, 2015).  But she "hoped that [she] would gain possession of [her] apartment again so [she] could get in there and clean it and rent it to someone who could pay."  Id.

14.    The Police Department had official trespass notice forms[9] bearing the City's name that were considered part of an officer's "standard equipment," carried in the trunk of a cruiser and maintained in the records office to be available for use.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Aside from the criminal trespass notice forms themselves, the Westbrook Police Department had nothing in writing about issuance and service of criminal trespass notices.[10] Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Captain Roth (second in command), a sergeant, and a patrol officer all testified consistently to that effect. Id.; Testimony of T. Morrell, Bench Trial (Aug. 4, 2015); Testimony of M. May, Bench Trial (Aug. 4, 2015).  The forms were used most often for retail establishments or public spaces like parks, but they were occasionally used for residential situations.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Other municipalities have similar forms.  Id.

---

[9] Criminal trespass notices generally are issued in connection with 17-A M.R.S.A. § 402, which provides that "[a] person is guilty of criminal trespass if, knowing that that person is not licensed or privileged to do so, that person" remains or enters "any place in defiance of a lawful order not to enter that was personally communicated to that person by the owner or another authorized person."  17-A M.R.S.A. § 402(1)(d), (e).

[10] The Westbrook Police Criminal Trespass Notice provides blank spaces for the officer to identify the complainant, the property trespassed upon, and the trespasser.  (Pl.'s Ex. 6).  The form also includes places for the "trespasser" to sign, acknowledging receipt of the notice.  Id.  The "Warning" section of the Notice form reads, "A person is guilty of Criminal Trespass if, knowing that that person is not licensed or privileged to do so, that person . . . [r]emains in any place in defiance of a lawful order to leave that was personally communicated to that person by the owner or other authorized person."  Id.  It provides that violation is a crime, carrying a penalty of up to six months in jail.  Id.  Further, the notice reads, "In accordance with the above cited statute, the complainant has authorized this agency to act as their agent or representative.  You are hereby ordered to CEASE AND DESIST FROM ENGAGING IN THE ABOVE DESCRIBED CONDUCT.  FAILURE TO COMPLY WITH THIS LAWFUL ORDER WILL RESULT IN CRIMINAL CHARGES BEING FILED IN COURT AND POSSIBLE ARREST."  Id.

15.    Westbrook police officers believed that having police serve official trespass notice forms served two useful purposes: documenting that a person had received notice in the proper wording that he or she was no longer welcome at a particular location, Testimony of T. Morrell, Bench Trial (Aug. 4, 2015), and having a police presence when the property owner was changing the locks or regaining possession, often a "contentious" situation.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).

16.    The Westbrook Police Department's policy was not to *evict* tenants. Testimony of T. Roth, Bench Trial (Aug. 4, 2015); Testimony of T. Morrell, Bench Trial (Aug. 4, 2015).  Instead, the police department required that property owners demonstrate proper documentation that they had previously engaged successfully in a civil eviction process.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).

17.    The Westbrook Police Department had no procedure for a person to appeal or seek rescission of a trespass notice that had been served upon him or her.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  (In contrast, the City of Portland's notice refers to "Appeals Information" and gives an official, the Neighborhood Prosecutor of the Portland Police Department, and a phone number to call.  (Pl.'s Ex. 16).)

18.    Captain Roth recruited Sergeant Timothy Morrell to assist in the LeClerc request, telling him that LeClerc wanted "assistance in standing by and trespassing anyone who was there while they had the locks changed."  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Morrell in turn recruited Patrol Officer Melissa May.  Testimony of T. Morrell, Bench Trial (Aug. 4, 2015).

19.     Both Sergeant Morrell and Officer May saw the writ of possession against Blake and never saw a writ of possession naming McBride.  Testimony of T. Morrell, Bench Trial (Aug. 4, 2015); Testimony of M. May, Bench Trial (Aug. 4, 2015).

20.     While criminal trespass notices occasionally were served in Westbrook at the request of a landlord, most often a landlord requested that the police serve a criminal trespass notice on a tenant's guest, who may have become unruly or caused some damage to the building.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  The Westbrook Police Department did not typically serve criminal trespass notices on tenants, and McBride's case was the only time that occurred during Captain Roth's tenure in the Westbrook Police Department.  Id.

21.     Amie LeClerc's request was "kind of out of the norm," the Westbrook police "don't serve those notices or enforce those notices generally," and Captain Roth wanted to know if the paperwork supported serving trespass notices.  Id. Captain Roth decided to consult the District Attorney's Office.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  He received approval from an Assistant District Attorney.  Id.

22.     Captain Roth did no other investigation but, based upon the property owner's word and the Assistant District Attorney's review, he reached the conclusion that everyone on the premises should be served with criminal trespass notices.  Id.  At the time, he did not know of the plaintiff McBride or that he claimed a tenancy interest in the apartment.  Id.

23.     Captain Roth told the Westbrook Police Chief what the officers were going to do,[11] and the police chief did not stop the undertaking.  Id.

24.     Captain Roth told Officers Morrell and May that anyone at the apartment should be served with the trespass notices.  Id.

25.     On July 9, 2013, the three police officers and Amie LeClerc went to the apartment building.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015). LeClerc remained in the driveway.  Id.  Captain Roth, Sergeant Morrell, and Officer May went to the apartment door.  Id.  No one was home except for a dog. Testimony of M. May, Bench Trial (Aug. 4, 2015).  Captain Roth went back outside.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Shortly thereafter, Blake arrived home.  Testimony of M. May, Bench Trial (Aug. 4, 2015).  Sergeant

---

[11] The details of what Captain Roth told the police chief were left vague:

> Q: Before you went out to 277 Main Street on that date, and oversaw the serving of the criminal trespass notices, you spoke to the Westbrook chief of police about this, right?
> A: Correct.
> Q: And you let him know what you were planning on doing?
> A: Correct.
> Q: And how you planned on doing it?
> A: Correct.
> Q: And it seemed fine to him, right?
> A: Yes.
>
> . . .
>
> Q: So after consulting with the person from the DA's Office, you felt comfortable moving ahead with your plan?
> A: Yes.  I told the chief what I was going to do and I think I may have shown him the paperwork.  Not given it to him, I think I may have held it up.
> Q: When you spoke to the chief before going out, did you even know who Mr. McBride was?
> A: No, I never heard that name before.
> Q: And was there any indication at the time you spoke to the chief that there was any tenant of the apartment other than Ms. Blake?
> A: No what Ms. Blake had told me was -- what Ms. LeClerc told me was that Anne Blake was the lessor of the apartment, or lessee of the apartment and there were two people that she suspected were staying in the apartment."

Testimony of T. Roth, Bench Trial (Aug. 4, 2015).

8

Morrell spoke with Blake.  Id.; Testimony of T. Morrell, Bench Trial (Aug. 4, 2015).  Blake told Sergeant Morrell that McBride lived in the apartment as well.  Testimony of A. Blake, Bench Trial (Aug. 4, 2015).[12]  Either Roth or Morrell (or perhaps both) telephoned McBride's supervisor at his place of employment to communicate that McBride should come home to help Blake move.  Testimony of M. May, Bench Trial (Aug. 4, 2015) (Officer May observed Sergeant Morrell calling); Testimony of T. Roth, Bench Trial (Aug. 4, 2015) (Roth called).  In the meantime, May served Blake with the trespass notice and explained it to her in Sergeant Morrell's presence.  Testimony of M. May, Bench Trial (Aug. 4, 2015).  Captain Roth left the scene before McBride arrived and did not speak with him at all.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).

26.     Thereafter, while Patrol Officer May was at the police cruiser, she saw McBride approaching the apartment building, stopped him, asked him his name and date of birth, and then entered this information on a notice of trespass.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  May then served McBride with the trespass notice while no one else was present.  Testimony of M. May, Bench Trial (Aug. 4, 2015).  McBride told May that he lived there, Testimony of M. May, Bench Trial (Aug. 4, 2015), and that he had not been evicted.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  May responded "well now you are."  Id.  She told McBride, "You've got less than 30 minutes to grab whatever you can

---

[12] That is how I interpret her testimony.  When asked whether she told the police officers specifically that McBride was a tenant at the apartment, Blake testified that she told the male police officer—which, based on the context, was almost certainly Sergeant Morrell—that McBride lived with her and had for years.

and leave the premises and that if [McBride] came back, [he] would be arrested." Id.

27.    There was no testimony that LeClerc in fact changed the locks while the police were there (or at any point, for that matter) or that she did anything other than wait in the driveway.

28.    Blake and McBride were already partially packed because they had been looking for an affordable location to which to move.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  But Apartment 2 was still where they were living, and they had to rush around throwing clothing and other essentials into black plastic garbage bags in the time allotted before they were compelled to leave the apartment.  Id.  They were not able to finish and left personal items behind in the apartment.  Id.

29.    Officer May asked McBride for his set of keys to the apartment (confirming that he only had one set of keys) and he gave them to her.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).

30.    One of the police officers suggested Motel 6 as a location that would permit Blake and McBride to bring their German Shepherd and called a taxi on their behalf.  Id.  They were compelled to leave the 277 Main Street property and stand on the sidewalk with their dog and bags of belongings to await the taxi. Id.  The taxi would not take the dog, so McBride walked with the dog the 45-minute distance to Motel 6 while Blake rode in the cab with their belongings.  Id.

31.     A day or two later, Captain Roth received a call from someone from Pine Tree Legal Assistance[13] who stated that the process concerning McBride and Blake had been improper.  Testimony of T. Roth, Bench Trail (Aug. 4, 2015).  Captain Roth then spoke with the Westbrook City Manager (or the Assistant City Manager—Roth was unsure) about the fact that the City might be facing a lawsuit.  Id.  The City Manager did not suggest that the police had followed improper procedure.  Id.

32.     Sergeant Morrell also reviewed the case—including the decision to serve the person who had been identified as Blake's boyfriend with a criminal trespass notice—and he "believed it was appropriate."  Testimony of T. Morrell, Bench Trial (Aug. 4, 2015).

33.     McBride and Blake borrowed money from friends and family in order to stay at Motel 6.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  They were compelled to leave Motel 6 on July 23 when they ran out of money for the room.  Id.

34.     McBride left a 50-inch television and sound system at 277 Main Street when the police demanded that he vacate the apartment on July 9, 2013.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  McBride had no place to keep and use the television once he was summarily evicted from Apartment 2.  Id.  McBride had been making payments under a "rent to own" agreement.  Id.  He stopped making payments, the television and sound system were

---

[13] Pine Tree Legal Assistance represented Anne Blake at her FED hearing and represented both McBride and Blake in this federal lawsuit.

repossessed, and he forfeited all his previous payments.   Testimony of K. McBride, Bench Trial (Aug. 4, 2015).

35.   McBride was not able to retrieve the rest of his and Blake's belongings until mid-August.   Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  He then rented a storage facility to hold them.  Id.; (Pl.'s Ex. 19).

36.   When they left Motel 6, McBride gave their dog (which they had raised since a puppy) to an animal shelter because they could no longer care for it where they were going.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015). For housing, McBride and Blake then proceeded to camp in the woods as other homeless people were doing.   Testimony of K. McBride, Bench Trial (Aug. 4, 2015); Testimony of K. Riley, Bench Trial (Aug. 4, 2015).  They moved into the woods with only the clothing on their backs, the trash bags of belongings, and some of McBride's electronics.   Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  Initially, they slept on a discarded twin bed mattress under a torn blue tarp slung over a tree branch.   Id.   After a week, McBride's employment supervisor purchased McBride a tent, an air mattress, and bedding.   Id.  Even with the tent, they often awakened damp and cold.  Id.  Using a wood fire, they cooked in kettles and pots they salvaged from deserted campsites.  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  There was no running water, so they purchased water by the gallon and carried it a mile into the woods.  Id.  Blake crafted a makeshift toilet by putting an abandoned toilet seat over a chair with a hole in it.  This attracted insects.  Id.  They washed in bottles of water, used the downpour from gutters, id., or stayed at Motel 6 for an occasional overnight in order to shower.  (Pl.'s Ex. 17).

37.    They faced "dangers of people stealing or robbing you . . . wild animals." Testimony of K. McBride, Bench Trial (Aug. 4, 2015).  There were "constantly fights, people shooting animals . . . people drinking, people fighting." Id.  McBride described one man as possessing a pellet gun, bows and arrows, and knives.  Id.  It was a "scary situation."  Id.  McBride felt that he could not go to the police about the dangers created by others at the campsite.  Id.

38.    When a police officer discovered their campsite, they were forced to move to another campsite, abandoning the campsite they had cobbled together. Id.

39.    Living in the woods put a substantial emotional strain on McBride. He described being "very angry, very frustrated, very depressed."  Testimony of K. McBride, Bench Trial (Aug. 4, 2015).    The situation also imposed extraordinary stress on Blake's and McBride's relationship, ultimately destroying it.  Id.  Because McBride worked the night shift, Blake stayed in the woods alone. Id.  When McBride returned at two or three o'clock in the morning, Blake would be "frantic," saying that she could not sleep because of the dangers around the campsite.  Id.  McBride testified that Blake "blames me for leaving her there at night when I had to go to work," and he blamed her for their having to live in the woods in the first place.  Id.  They no longer live together or have a relationship. Id.

40.    With the help of a veterans' housing program, McBride eventually secured an apartment on October 1, 2013.  Id.; Testimony of K. Riley, Bench Trial (Aug. 4, 2015).

41.    McBride did not have a viable habitability defense to an FED action if the LeClercs had named him in such an action in 2013.[14]

**CONCLUSIONS OF LAW**

1.    This court has federal question jurisdiction under 28 U.S.C. § 1331. McBride has sued Westbrook under Section 1983, seeking to enforce his Fourteenth Amendment right against being deprived of property without due process of law.  42 U.S.C. § 1983; Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) ("[a] claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law.").

2.    The parties have stipulated that the Westbrook police were operating under color of law when they served the criminal trespass notices in this case. Stipulations Read on the Record, Bench Trial (Aug. 4, 2015).

3.    Westbrook, as a Maine municipality, does not have immunity from suit under the Eleventh Amendment.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (the bar of the Eleventh Amendment to suit in federal courts "does not extend to counties and similar municipal corporations.").

4.    However, a municipality has liability for damages or injunctive relief on account of the actions of employees like police officers only when they act pursuant to the municipality's policy or custom.  Kelley v. LaForce, 288 F.3d 1,

---

[14] Breach of warranty of habitability is an affirmative defense under the FED statute.  See 14 M.R.S.A. § 6002(3).  Blake unsuccessfully advanced that defense in the 2013 FED action against her in state court where she was represented by one of McBride's current lawyers.  I do not find credible the new and enhanced allegations made at this trial.

9 (1st Cir. 2002) (citing <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 690–91 (1978)); <u>L.A. Cnty., Cal. v. Humphries</u>, 562 U.S. 29, 31 (2010) (the "policy or custom" requirement also applies when a plaintiff seeks prospective relief, like an injunction or a declaratory judgment).

5.      Here, McBride challenges the police actions requiring him to vacate his apartment when he had received no prior notice and no opportunity for a hearing to contest the legitimacy of his eviction.  He says that the police should have conducted a further investigation once he told them he lived there.

6.      Given the jury's verdict that McBride was a tenant at will on July 9, 2013, he had at that time a property interest created by Maine law that qualifies as property under the Fourteenth Amendment.  <u>See</u> <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 538 (1985) ("Property interests . . . 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'") (citing <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972)); <u>Ward v. Downtown Dev. Auth.</u>, 786 F.2d 1526, 1528–29 (11th Cir. 1986) (month-to-month tenancy at will is a compensable property interest; "the fact that the tenancy was of potentially short duration did not change the nature of the interest.").[15]

7.      The First Circuit has recognized that "in certain circumstances, a police officer's participation in an unlawful eviction can implicate a tenant's Fourth and Fourteenth Amendment rights and give rise to liability under 42 U.S.C. § 1983."  <u>Higgins v. Penobscot Cnty. Sheriff's Dep't</u>, 446 F.3d 11, 14 (1st

---

[15] Because McBride has failed to show custom or policy, I do not decide the scope of his property interest under Maine law, but I recognize that by statute Maine has expanded the attributes of a tenancy at will.  See 14 M.R.S.A. § 6002(1)(A).

Cir. 2006); see also Thomas v. Cohen, 304 F.3d 563, 578 (6th Cir. 2002) ("inasmuch as an interference with Plaintiffs' state-recognized leasehold property interests constitutes a violation of their rights to procedural due process and freedom from unreasonable seizures, a federal constitutional right is clearly implicated in the instant case."); Fuentes v. Shevin, 407 U.S. 67, 71, 80–83 (1972) (state issuance of a writ of replevin and local law enforcement's seizure of the target property constituted a taking—even where the individuals did not have full legal title, and the seizure may have been only temporary).

8.     But because I conclude that McBride has failed to prove that the Westbrook police acted pursuant to custom or policy in compelling him to vacate the apartment on July 9, I do not decide what process was due McBride under the Fourteenth Amendment.

## POLICY OR CUSTOM

9.     McBride bears the burden of showing that "through its *deliberate* conduct, the municipality was the moving force behind the injury alleged." Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011) (citations and quotations omitted) (emphasis in original).

10.     The City of Westbrook cannot be held liable for the actions of non-policymaking police officers based solely upon the fact that they were municipal employees.  Id.  Instead, McBride must prove that the police acted pursuant to either (1) a Westbrook policy or (2) a Westbrook custom, in unconstitutionally depriving him of his property interest as a residential tenant.  Kelley, 288 F.3d at 9 (citing Monell, 436 U.S. at 691).

### a. Policy

11.    A municipality is liable for acts taken pursuant to a *policy* when the resulting deprivation was the result of 1) "decisions of its duly constituted legislative body"; or 2) decisions "of those officials whose acts may fairly be said to be those of the municipality." Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997) (citation and quotations omitted).   In those instances, "[m]unicipal liability attaches only where the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered." Id. (quotations and citation omitted).

12.    McBride has presented no evidence of any policy adopted by the City of Westbrook's legislative body, *i.e.*, the City Council.

13.    With respect to actions by officials "whose edicts or acts may fairly be said to represent official policy," Bordanaro v. McLeod, 871 F.2d 1151, 1155 (1st Cir. 1989) (quoting Monell, 436 U.S. at 694), Captain Roth gave the order that anyone who was at the apartment on July 9 should be served with a criminal trespass notice.  Neither Sergeant Morrell nor Patrol Officer May had any policy-making authority.  At the time, Captain Roth believed that Blake was the only tenant and that she had been the subject of a proper state court FED action and writ of possession.

14.    In order for the City of Westbrook to be held liable for what happened to McBride, the person generating the challenged policy—here, Captain Roth— must have been "responsible for establishing final policy" respecting the issuance of criminal trespass notices.  See Wilson v. City of Boston, 421 F.3d 45, 59 (Aug. 31, 2005) (in order to constitute policy for purposes of finding municipal

liability, the municipal official must have "'final policy-making authority' in the relevant area of the city's business").[16]   "[W]hether an official had final policymaking authority is a question of state law."  Pembaur, 475 U.S. at 483 (plurality); see also McMillian v. Monroe Cnty., Ala., 520 U.S. 781, 786 (1997) (inquiry into whether a state official makes county policy "is dependent on an analysis of state law."); Walden v. City of Providence, R.I., 596 F.3d 38, 56 (1st Cir. 2010) ("[w]hether an official has this requisite level of specific policymaking authority is a matter of state law.").

15.   In Westbrook, the Police Chief is the final policy maker, and he had supervisory authority over Captain Roth and the Westbrook Police Department. Testimony of T. Roth, Bench Trial (Aug. 4, 2015).[17]  Captain Roth's action alone was not enough to establish Westbrook policy.

16.   If "authorized policymakers"—here, the police chief—"approve[d] a subordinate's *decision and the basis for it*," that "ratification would be chargeable to the municipality because their decision is final."[18]   City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality)[19]; see also Matusick v. Erie Cnty.

---

[16] Wilson relies on Section II.B. of Pembaur for this conclusion, a portion of the Supreme Court decision that commanded only a plurality.  Wilson, 421 F.3d at 59 (citing Pembaur, 475 U.S. at 481-83).  In the sections of Pembaur that commanded a majority, the Court used the term "authorized decisionmakers."  Pembaur, 475 U.S. at 481.

[17] Neither party presented any evidence about Westbrook charter provisions or ordinances that might bear upon policy-making authority.

[18] I do not accept the plaintiff's argument that the "District Attorney" was an "authorized decisionmaker" for the City of Westbrook.  There was no evidence that the District Attorney for District Number 2 (which includes all of Cumberland County) had any authority to make this type of decision for the City of Westbrook. 30-A M.R.S.A. § 254.

[19] I treat the Praprotnik plurality as recognizing a means of holding a municipality subject to liability in instances of "ratification"—where a final policy decisionmaker approves of a subordinate's decision and the basis for it.  See Praprotnik, 485 U.S. at 127.  The Praprotnik concurrence argued that even this formulation was too narrow.  Praprotnik, 485 U.S. at 144 (Brennan, J., concurring) (objecting to the plurality's "narrow and overly rigid view of when a municipal official's policymaking authority is 'final.'").

Water Auth., 757 F.3d 31, 73 (2d Cir. 2014) (citing Praprotnik, 485 U.S. at 127, for the proposition that "if authorized policymakers approve subordinate's decision 'and the basis for it,' their ratification is chargeable to the municipality"); Bouman v. Block, 940 F.2d 1211, 1231 (9th Cir. 1991) ("If the authorized policymakers retain the authority to measure the official's conduct for conformance with *their* policies, or if they approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); Gattis v. Brice, 136 F.3d 724, 727 (11th Cir. 1998) ("A policymaker's approval of an unconstitutional action can constitute unconstitutional county policy only when the policymaker 'approve[s] a subordinate's decision *and the basis for it.*'"); Craig v. Maine Sch. Admin. Dist. No. 5, 350 F. Supp. 2d 294, 297 (D. Me. 2004) ("Although a municipality may be subject to liability in instances where it ratifies the conduct of an employee without policymaking authority, a showing of ratification requires that the 'authorized policymakers approve a subordinate's decision and the basis for it.'").

17.    Captain Roth testified that he spoke to the Westbrook police chief, a final policy maker, and "let him know" what he "plan[ned] on doing." Testimony of T. Roth, Bench Trial (Aug. 4, 2015). But Captain Roth did not testify that he disclosed his intention to serve a criminal trespass notice on a tenant who was not listed on the writ of possession either by name or as "all other occupants," and the evidence does not support such an inference. Neither party called the police chief to testify about what he was told and what he approved. It was McBride's burden to show that an authorized policymaker approved serving a criminal trespass notice on a tenant at will who was not named in a writ of

possession either by name or as "all other occupants," and compelling him to vacate his apartment. Without this, McBride did not establish that an authorized policymaker approved Captain Roth's decision.

18.    What is more, there is no evidence that either Captain Roth or the police chief knew beforehand that a *tenant* (other than Blake) would be served with the criminal trespass notice and compelled to vacate.  McBride's claim of tenancy, to the extent that such a claim was made, was presented only to Sergeant Morrell (when Blake told him that McBride lived there) and Patrol Officer May (when McBride said that he lived there).  Since the police chief and Captain Roth did not learn beforehand of McBride's claim to be a tenant, neither Roth nor the police chief created a policy that *as a tenant* McBride should be compelled summarily to vacate his apartment.  Neither Sergeant Morrell nor Patrol Officer May was an authorized decisionmaker for such a policy and their statements and conduct vis-à-vis McBride do not create vicarious liability for the City.

19.    Sergeant Morrell testified that he "reviewed" service of the criminal trespass notice on McBride "afterwards" and "believed it was appropriate." Testimony of T. Morrell, Bench Trial (Aug. 4, 2015).  But Sergeant Morrell was not an authorized decisionmaker for City of Westbrook policy, and this post-hoc review does not make the decision to serve McBride chargeable to the municipality.

20.    I reject the plaintiff's argument that the evidence shows that the Westbrook City Manager ratified the police officers' conduct.  After issuing the criminal trespass notice to McBride and receiving a call from Pine Tree Legal,

Captain Roth spoke with someone at the City Manager's Office. Testimony of T. Roth, Bench Trial (Aug. 4, 2015) (Roth was unsure whether he spoke with the City Manager or the Assistant City Manager). However, Captain Roth's discussion with the City Manager's Office was limited to issues of liability—whether the City was facing a lawsuit and the insurance implications. Id. No evidence was presented that the City Manager ratified, approved of, or authorized issuing a criminal trespass notice to tenant McBride.

21.   Thus, the police actions that resulted in McBride's loss of his property interest as a tenant at will were not pursuant to Westbrook policy.

### b. Custom

22.   A municipality can also be liable for "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker [when] *the relevant practice is so widespread as to have the force of law*." Silva, 130 F.3d at 31 (emphasis added) (citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 403 (1997)). The practice must be so "wellsettled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Bordanaro, 871 F.2d at 1156.

23.   Westbrook's issuance of criminal trespass notice forms alone is not sufficient. McBride needed to demonstrate that the City of Westbrook had a custom of committing the constitutional violation he charges here—compelling tenants to leave their residences without procedural protections. McBride presented no evidence of any other instance where the Westbrook Police Department took the landlord at his or her word in displacing a tenant from a

residence where the tenant was not named on a writ of possession either by name or as "all other occupants."

24.    Instead, it was undisputed that the City of Westbrook Police Department primarily serves criminal trespass notices in public spaces like parks, and at stores or retailers.  Captain Roth and Sergeant Morrell both testified that they have served these criminal trespass notices at residences, Testimony of T. Roth, Bench Trial (Aug. 4, 2015); Testimony of T. Morrell, Bench Trial (Aug. 4, 2015), but typically on the unruly *guests* of a tenant.  Testimony of T. Roth, Bench Trial (Aug. 4, 2015).  Captain Roth recalled one time that a tenant asked that a criminal trespass notice be served on someone in his or her apartment.  Id.  But the police "didn't typically serve them on tenants . . . usually it's someone other than a tenant."  In fact, the McBride incident, according to Captain Roth, "since I've been in Westbrook that's the only instance where we received . . . that type of paperwork [the writ of possession and FED judgment] and served trespass based on it."  Id.  According to Sergeant Morrell, "there have been times" that criminal trespass orders have been served in the landlord-tenant residential setting, Testimony of T. Morrell, Bench Trial (Aug. 4, 2015), but he was not aware of situations in which the criminal trespass order was used to evict tenants.  Id.

25.    McBride offered only this single incident of what happened to him as a tenant on July 9 as evidence of a Westbrook municipal custom.  That is not sufficient to show that the officers' conduct here constituted "the way things [were] done and [had] been done."  Bordanaro, 871 F.2d at 1156 (citations and quotations omitted).  Because I find that this single incident does not

demonstrate that a custom or practice is "wellsettled" or "widespread," I conclude that in compelling tenant McBride to vacate his apartment the officers did not act pursuant to a municipal custom for purposes of Section 1983.  <u>Silva</u>, 130 F.3d at 31.

26.    Compelling McBride to vacate his apartment on July 9 was wrong, but McBride has not established that the police deprived him of his property interest as a tenant at will pursuant to Westbrook policy or custom, a prerequisite for municipal liability.  <u>Monell</u>, 436 U.S. at 694; <u>Humphries</u>, 562 U.S. at 31.

<b>Conclusion</b>

Without evidence that the City of Westbrook had either a policy or custom of compelling residential tenants to leave their apartments without notice or a hearing, there is no municipal liability.  Accordingly, judgment shall enter for the defendant City of Westbrook.

**So Ordered.**

**Dated this 4th day of September, 2015**

/s/D. Brock Hornby
**D. Brock Hornby**
**United States District Judge**